UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| WILLIAM MAYBIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:16-CV-525 (CEJ) |
| | ) | |
| CORIZON HEALTHCARE and | ) | |
| WILLIAM MCKINNEY, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the joint motion of defendants William McKinney, M.D., and Corizon, LLC for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1] Plaintiff has responded in opposition and the issues are fully briefed.

## I.     Background

Plaintiff William Maybin brings this action under 42 U.S.C. § 1983, claiming that defendants were deliberately indifferent to his serious medical needs, in violation of the Eighth Amendment. At all relevant times, plaintiff was an inmate in the Missouri Department of Corrections (MDOC). He has been confined at the Potosi Correctional Center (PCC) since his transfer there in November 2014. William McKinney, M.D., is the sole acting physician at PCC.  Corizon, LLC provides medical care to prison inmates.

### Treatment for Respiratory Conditions

#### i.     Pre-Transfer Treatment

---

[1] Defendants are incorrectly named in the amended complaint as "Corizon Healthcare" and "William McKenney." [Doc. #26 at 3].

In November 2013 plaintiff reported blood in his sputum. In response, MDOC medical personnel conducted several tests in December 2013, including (1) a chest x-ray, (2) a tuberculosis skin test, and (3) an AFB smear of plaintiff's sputum (screening for tuberculosis or other mycobacteria). All of the tests yielded normal results.

Plaintiff next received an exam from a MDOC physician in March 2014 after reporting a cough. He also relayed that he first developed respiratory symptoms following an influenza vaccination in October 2013. The physician ordered albuterol nebulization treatment, chest and sinus x-rays, and sputum testing.[2] Those x-rays revealed no chest abnormalities, but did show potential allergic rhinitis and sinusitis. Later that same month, an MDOC physician diagnosed plaintiff with allergic rhinitis and sinusitis; plaintiff received prescriptions for Cipro, Claritin, and saline spray.[3] During that visit, the MDOC physician noted that plaintiff's "respiration was even and unlabored, and his lungs were clear." [Doc. #43-1 at 10].

In April 2014, the bloody sputum issue resurfaced, and an MDOC physician subsequently renewed plaintiff's Cipro prescription to treat his recurrent sinus infection. Moreover, April 2014 records link pinkish mucous to plaintiff's unresolved sinusitis. Notes also state that "throat and nose regions are currently neg[ative] for traces of mucous or pink drainage," but that pink drainage might "eventually wind up in his airway and will need to be coughed out." [Doc. #43-2 at 76].

---

[2] Albuterol nebulization treatments are used "to prevent wheezing, difficulty breathing, chest tightness, and coughing" in people with chronic obstructive pulmonary disease, chronic bronchitis, and emphysema. *See* https://medlineplus.gov/druginfo/meds/a601063.html (last visited July 28, 2017).

[3] Ciproflaxin is used to treat or prevent bacterial infections. *See* https://medlineplus.gov/druginfo/meds/a688016.html (last visited July 31, 2017).

MDOC physicians took additional sinus x-rays in early July 2014. They noted several abnormalities. Later that month, plaintiff complained of "continuous pain in the chest, troubled breathing," and "coughing up blood." [Doc. #54 at 10]. A physician opined that plaintiff might have microcytic hypochromic anemia[4]; records also reflect that plaintiff had hilar granulomas on a previous chest x-ray from March. The physician considered that plaintiff might have sarcoidosis or hypersensitivity pneumonitis.[5] Following this assessment, plaintiff received a prescription for Cetirizine (an antihistamine) and an albuterol nebulizer treatment for shortness of breath, in addition to further lab work and spirometry testing.[6] An August 2014 chest x-ray produced normal results. No pulmonary infiltrates were observed, though granulomas remained. Plaintiff then had a spirometry test in August 2014; McKinney contends that the spirometry test did not produce results because plaintiff talked through the attempted procedure. Plaintiff, for his part claims he was simply responding to the nurse. Plaintiff continued to report shortness of breath and blood in his sputum in late August 2014; upon examination a nurse observed no signs of respiratory distress.

### ii.    *Treatment after Transfer to PCC*

---

[4] Records describe the condition as "microtic hypocromia." Microcytic means that red blood cells are abnormally small; red blood cells that are hypochromic are pale. *See* https://ghr.nlm.nih.gov/condition/iron-refractory-iron-deficiency-anemia#synonyms (last visited July 31, 2017).

[5] Sarcoidosis "is a disease that can affect any organ or system in the body. People with sarcoidosis develop granulomas (small abnormal clumps of tissue) in certain parts of the body"; the lungs are the "most commonly affected part of the body in people who have sarcoidosis." https://familydoctor.org/condition/sarcoidosis/?adfree=true (last visited July 31, 2017). Sarcoidosis may cause a cough or chest pain. *Id.*

[6] Spirometry is "a common office test used to assess how well your lungs work by measuring how much air you exhale, how much you exhale and how quickly you exhale. Spirometry is used to diagnose asthma, chronic obstructive pulmonary disease (COPD) and other conditions that affect breathing." http://www.mayoclinic.org/tests-procedures/spirometry/basics/definition/PRC-20012673?p=1 (last visited July 31, 2017).

Plaintiff reported respiratory symptoms to nurses in November 2014 and December 2014. Specifically, he complained of burning in his chest, congestion when coughing up dark red sputum, and shortness of breath. The nurse administered a nebulizer treatment for plaintiff's wheezing in November 2014. Plaintiff returned in late December 2014 and a nurse provided a nebulizer treatment due to diminished sounds in one lung. Plaintiff also produced a sputum sample for testing in December 2014.

In January and February 2015 plaintiff persisted in reporting chest pain, burning, and numbness on multiple occasions. McKinney evaluated plaintiff's respiratory conditions on February 4, 2015. Noting plaintiff's history of negative evaluations and lack of symptomology, McKinney ordered a spirometry test. Plaintiff reported doing pushups and other exercises three to four times each week. MDOC medical personnel conducted the aforementioned spirometry exams on February 20 and 23, 2015. Plaintiff "reported he did not have enough air to do the test," and "did not follow directions well." [Doc. #43-1 at 17].

McKinney saw plaintiff again on March 11, 2015. During that visit plaintiff reiterated that his respiratory symptoms originated from an influenza vaccination. Medical records indicate that plaintiff reported less coughing.[7] Plaintiff further averred that his symptoms generally included fatigue, weakness, chest pain, drainage of pink to red colored sputum, and shortness of breath. McKinney observed (1) good breath sounds, (2) no cough, (3) a normal diagnostic history including chest x-rays, labs, and an AFB smear, and (4) no indication of disease. McKinney also ordered additional lab work.

---

[7] Plaintiff disputes this note. [Doc. #55 at 8].

Plaintiff's respiratory symptoms were again reviewed by a nurse in April 2015, when he complained of shortness of breath. The nurse noted no shortness of breath, cough, or distress; plaintiff had 99 percent oxygen saturation level. Plaintiff gave a nurse a sample of his bloody sputum on May 18, 2015, which was preserved and then "showed" to McKinney in the morning. [Doc. #43-3 at 41]. The nurse also examined plaintiff's respiratory status on that date, and found that plaintiff had "easy and regular respirations," clear lungs, and oxygen saturation at 98 percent. [Doc. #43-1 at 20]. On May 21, 2015, plaintiff returned to a nurse to inquire about the testing of his sputum sample. He was informed at that time that the sample was "inconsistent with any chronic illness." [Doc. #43-3 at 41].

On August 26, 2015, plaintiff reported "subtle fatigue and a burning sensation in his chest and abdomen." [Doc. #43-1 at 24]. The parties disagree as to plaintiff's last episode of bloody sputum. McKinney noted that plaintiff had good breath sounds.

In an appointment with McKinney on October 5, 2015, plaintiff's lungs demonstrated good air movement and clarity. Spirometry testing showed normal results. Plaintiff's declaration reflects visits to complain of bloody sputum and provide further samples in October and November 2016.

### Treatment for Podiatry Complaints

#### i. *Pre-Transfer Treatment*

Plaintiff saw a physician at Truman Medical Center in 2006, while incarcerated in the Jackson County Jail. He does not provide records of this visit but states that a podiatrist instructed him to wear "soft sole orthopedic shoes." [Doc.

#54 at 3].[8] An MDOC doctor noted that plaintiff had "significant bunion deformit[ies]" on both feet in January 2012; the physician did not observe any tenderness or tissue breakdown. [Doc. #43-2 at 13]. Notes indicate that plaintiff had not been approved for shoes in the past, but that he had bunion splints. Records also indicate the potential for "amputation of foot deformity" as part of a treatment plan. [Doc. #57 at 1].

Plaintiff filed numerous treatment requests for bunion-related pain from April 2012, to January 2013. Notes from an MDOC physician in May 2012 state that plaintiff had "difficulty getting wider shoes from custody to accommodate his bunion deformity," and that his bunions were "impressive." [Doc. #57 at 3]. Because plaintiff was in administrative segregation, the physician stated that accommodation was "a moot point." *Id.* During a November 11, 2012, appointment an MDOC physician recommended that plaintiff avoid running, conduct x-rays of both feet, and use bilateral bunion splints. And the November 12, 2012, x-ray of plaintiff's right foot revealed "subtle bony sclerosis" in the first metatarsophalangeal articulations; the impression was "hallux valgus with subtle periarticular soft tissue swelling" and mild degenerative changes of the first metatarsophalangeal articulation. [Doc. #43-2 at 33–34].

In multiple visits in February 2013, doctors emphasized the prominence of plaintiff's bunions. Records from a February 4, 2013, doctor encounter state that

---

[8] Defendants argue that plaintiff cannot cite to this 2006 record because it is "inadmissible hearsay" under Federal Rule of Evidence 801. [Doc. #60 at 8]. Under Federal Rule of Civil Procedure 56(e), affidavits may be considered by a court deciding a motion for summary judgment. Fed. R. Civ. P. 56(e). But, those affidavits should "set forth such facts as would be admissible in evidence." *Id.* And "[w]hen an affidavit contains an out-of-court statement offered to prove the truth of the statement that is inadmissible hearsay, the statement may not be used to support or defeat a motion for summary judgment." *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111 (8th Cir. 2005). Accordingly, the 2006 podiatrist recommendation is inadmissible, and the Court will not consider the evidence in its decision.

"the bunion deformity is not viewed as an indication for special shoes, but [his] feet have impressive degree of bunion." [Doc. #57 at 7]. The shoe committee determined that medical shoes should be prescribed upon plaintiff's release to the general population. He instead received bunion splints in April 2013. Plaintiff then requested surgery for his foot issues in September 2013, during a nursing encounter.

Plaintiff received his medical shoes in October 2013. And he had an evaluation of his feet in May 2014; that visit resulted in diagnoses of bunions and mild degenerative joint disease.

### ii. Treatment after Transfer to PCC

In November 2014, plaintiff submitted a request for new medical shoes. He did not receive them. McKinney examined plaintiff's feet in January 2015. McKinney noted a normal gait, no limping, obvious bilateral flat feet with pronation, and bilateral bunions. But he did not observe any "abrasions or changes to [p]laintiff's feet which would indicate that [plaintiff's] shower shoes were rubbing." [Doc. #43 at 11]. McKinney recommended that plaintiff use arch support once released from administrative segregation. He also recommended wider shoes to accommodate plaintiff's bunions. He did not believe that medical shoes were merited.

On June 10, 2015, plaintiff saw McKinney and requested surgery for his bunions. McKinney did not observe redness, soft tissue swelling, or open areas; he had superficial calFalloues on his right foot, as well as a "fluid gait with no limp." [Doc. #43-1 at 21]. Plaintiff stepped down from the examination table without discomfort. McKinney determined that surgery was not medically indicated, and that shoes of the appropriate width would be the prudent treatment.

On November 23, 2015, plaintiff met with McKinney regarding his bunions. McKinney noted that plaintiff was currently in administrative segregation and that he "still wants surgery." [Doc. #43-3 at 69]. McKinney noted plaintiff's smooth step off exam table. He determined that "surgery is not currently medically necessary." *Id.*

### **Treatment for Knee Instability and Pain**

#### *i.     Pre-Transfer Treatment*

In July and August 2012, nurses evaluated plaintiff's knee pain. Plaintiff requested a knee brace during those visits. In particular he "reported he fell without a brace for his right leg." [Doc. #43-1 at 4]. However, medical personnel did not observe swelling or popping sounds, and plaintiff exhibited a full range of motion. Plaintiff and McKinney disagree about whether plaintiff had been approved for surgery at that time. Plaintiff did not report to appointments regarding a potential operation. The parties dispute whether plaintiff knew about the appointments and intentionally missed them.

In October and November 2012 plaintiff again complained of knee pain and requested surgery. A nurse evaluated plaintiff's knee on November 15, 2012. She found that he had full range of motion in his knee. And he received a similar referral to a physician for his knee pain in November 2012, but failed to attend the appointment; plaintiff states that he was not notified of the appointment.

In September and October of 2013, plaintiff continued to report knee pain and a need for surgery on his right knee to nurses. On October 28, 2013, a physician noted plaintiff had "a good gait with ambulation," but that he sat "gingerly" and was "careful about bending his knee." [Doc. #43-2 at 48]. Although

the MDOC physician did not observe obvious swelling or gross abnormalities, plaintiff demonstrated tenderness and slight crepitus with palpation. The physician recommended Meloxicam and a knee sleeve for the left knee pain and instability. Plaintiff received a knee sleeve in December 2013.

A nurse evaluated plaintiff in January 2014 for bilateral knee pain, knee "popping," as well as request for a bottom bunk. [Doc. #43-1 at 8]. The nurse's review indicated that he did not have any deformities, swelling, or discoloration, although he wore a knee sleeve.

An MDOC physician examined plaintiff's knees in May 2014, pursuant to plaintiff's bottom bunk lay-in request. An exam of plaintiff's knees revealed "tenderness along the medial and lateral joint line of the right knee," and "trace swelling and some tenderness in the right ankle," but no tears. [Doc. #42 at 4]. X-rays of plaintiff's right knee in May 2014 showed no abnormalities. Later that month, an MDOC physician diagnosed chronic knee and ankle strains; he prescribed Indomethacin (Indocin), analgesic balm, continued use of a right knee sleeve, and the issuance of a right ankle sleeve. The physician recommended steroid injections and imaging of the right ankle if plaintiff's knee pain, ankle instability, and sciatica did not improve. Subsequent x-rays of plaintiff's ankle showed no abnormalities and plaintiff received a prescription for arch supports.

In August 2014 a nurse observed that plaintiff had a mild limp, slightly more swelling of the right knee, and wincing on palpation of the right knee. Plaintiff requested a knee support on September 30, 2014; he told a nurse that MDOC officials held it in impound.

### ii.    Treatment after Transfer to PCC

McKinney evaluated plaintiff's knee pain (among other complaints) on April 12, 2015. Plaintiff told McKinney that he suffered right knee pain while jogging in place. McKinney prescribed Indocin and continued plaintiff's Pamelor prescription to treat plaintiff's general joint pain. In June 2015, a nurse referred plaintiff to McKinney for "slight swelling below" plaintiff's knee; plaintiff continued to request a knee sleeve at that time. [Doc. #43-3 at 52].

McKinney evaluated plaintiff on July 6, 2015. McKinney determined that plaintiff did not require a neoprene sleeve; in particular he noted plaintiff's prior normal x-ray. He did observe increased movement in plaintiff's knees, which demonstrated some instability; but he also stated that plaintiff had no warmth, diffusion, palpable defect or any other abnormality in his knees. Moreover, plaintiff did not limp and easily climbed on and off the exam table without discomfort. Therefore, McKinney prescribed quad and hamstring exercises.

Plaintiff reported knee pain to a nurse again several weeks later. He requested a knee sleeve and reported swelling while doing jumping jacks. On August 26, 2015, plaintiff also reported right knee pain to McKinney. Plaintiff told McKinney that he had done pushups, sit-ups and calisthenics, until custody removed his tennis shoes. McKinney also noted plaintiff's fluid gate and ability to climb on and off the exam table. On September 19, 2014, plaintiff complained of bilateral knee pain during a nurse encounter.

McKinney examined plaintiff on October 9, 2015, for knee pain. Plaintiff expressed his desire to play basketball. During the appointment, McKinney noted a fluid gait and normal heel strike and stride. Plaintiff told McKinney that he

experienced pain when walking on his toes. McKinney noted no abnormalities and recommended quad and hamstring exercises.

On November 23, 2015, McKinney conducted an examination of plaintiff's knees. He assessed that plaintiff had chronic right knee pain, but found no swelling or erythema. McKinney prescribed Naproxen.

Plaintiff reported pain in his left hip, right knee, and bunions on May 2, 2016. Plaintiff "refused to squat for fear of knee pain," though the right knee appeared normal. [Doc. #43-1 at 29]. McKinney gave plaintiff a prescription for ibuprofen. Plaintiff continued to report arthritic pain in his right hip and right knee in June 2016.

## Treatment for Chronic Pain: Neuralgia & Sciatica

### i.    Pre-Transfer Treatment

In January 2012, plaintiff received Gabapentin (Neurontin) (an anticonvulsant), Carbamazepine (Tegretol) (an anticonvulsant), and ibuprofen to manage his pain.

On April 6, 2012, plaintiff's prescription for Gabapentin was discontinued because it was suspected that he was "diverting" it to another inmate.   The prescription was reinstated on October 12, 2012, after plaintiff did not receive a conduct violation for diverting.    Until November 2013, MDOC physicians renewed the prescriptions because plaintiff never actually received a custody violation. While his Gabapentin prescription was in flux, doctors prescribed Trileptal and Tegretol. The parties dispute plaintiff's discomfort after the discontinuation of his Gabapentin prescription.

In December 2013, plaintiff complained that Trileptal was not effective. Records reflect that plaintiff "was unfortunately caught diverting [G]abapentin and that med had to be stopped." [Doc. #43-2 at 57]. Records from that visit indicate that plaintiff "tolerat[ed] Trileptal" and that the dosage would be increased. [Doc. #43-2 at 57].

Plaintiff disputes that he told a physician in April 2014 that his trigeminal neuralgia responded to Naproxen or Trileptal.[9] In August 2014, plaintiff rated his trigeminal neuralgia pain as 5 out of 10; the physician disagreed, noting that plaintiff engaged with his activities of daily living, lifted weights, played sports, and worked. The MDOC physician determined that plaintiff's condition was stable.

In August 2014 MDOC permanently terminated plaintiff's prescription for Gabopentin, "due to [a] state-wide removal" of the drug. [Doc. #54 at 10; #43-1 at 95]. At that time plaintiff expressed a great deal of concern because it was "the only drug that has ever worked" in treating his trigeminal neuralgia. *Id.* His weaning dose expired in September 2014, but was replaced by another medication-Nortriptyline.

### ii. Treatment after Transfer to PCC

On November 18, 2014, plaintiff reported to the chronic pain care clinic as a new transfer to PCC, and received an evaluation from McKinney. Medical records indicate that plaintiff was "previously on Neurontin" but "was caught diverting." [Doc. #43-2 at 105]. He therefore took Nortriptyline and Indocin. Records also show that plaintiff admitted that Nortriptyline had some pain mitigating effect. McKinney noted that plaintiff had no current symptoms of trigeminal neuralgia.

---

[9] Trigeminal Neuralgia "is a type of chronic pain that affects your face," causing "extreme, sudden burning or shock-like pain." https://medlineplus.gov/trigeminalneuralgia.html (last visited July 31, 2017).

Plaintiff disputes this assertion; according to plaintiff, he informed McKinney of the frequency and severity of his trigeminal neuralgia pain, as well as the ineffectiveness of Nortriptyline. During that visit, McKinney observed that plaintiff had (1) a normal gait, (2) the ability walk on his toes and heels, (3) full lateral bending, twisting, and forward flexion of the spine to ninety degrees, (4) full range of motions in his legs, and (5) a negative bilateral test for possible lower back disc herniation. McKinney continued plaintiff's prescription for Nortriptyline, and considered plaintiff active and stable.

On April 21, 2015, plaintiff consulted with McKinney in the chronic pain clinic. McKinney noted that plaintiff remained physically active, and only reported right knee pain with jogging. The parties dispute whether plaintiff reported neuralgia or sciatic pain. McKinney continued plaintiff's Nortriptyline prescription and started Indocin for joint pain; he also issued a lay-in for extended cuffs.

Plaintiff states that he continued to complain of the ineffectiveness of his pain medication, Nortriptyline, in October 2015. McKinney's notes reflect that during a chronic pain clinic visit on October 13, 2015, plaintiff was "very vague" about the nature of his current symptoms and did not appear in any distress. [Doc. #43-3 at 36–37]. Further, plaintiff "did not report any symptoms or signs of trigeminal neuralgia." [Doc. # 43-1 at 26]. McKinney determined that plaintiff should continue his use of Nortriptyline, which plaintiff "indicate[d] remain[ed] helpful." [Doc. #43-3 at 37].

Plaintiff complained of left clavicle pain to McKinney and other MDOC medical personnel in January and February 2016. McKinney did not observe visible physical issues, but he ordered a chest x-ray. February 2016 x-ray notes indicate "mild

thoracic spondylosis and rotoscoliosis." [Doc. #43-3 at 76]. McKinney remarked that the x-ray results were normal.

In March 2016, plaintiff continued to tell nurses about the ineffectiveness of his Nortriptyline prescription, and his persistent collarbone, neck, and shoulder pain, as well as his hip and knee pain. He also told McKinney on March 10, 2016, that he was doing some weightlifting and other exercises. Plaintiff did not report trigeminal neuralgia or sciatica symptoms. Plaintiff alleges that these notes only reflect McKinney ignoring his pain. Plaintiff failed to show up for an April 2016 appointment to address his collarbone, neck, and knee pain.

On May 2, 2016, plaintiff described how activity led to left hip, right knee, and foot pain. McKinney performed an examination; he noted a slow but fluid gait, with no limp, and no evidence of discomfort getting on and off of the examination table. Plaintiff refused to walk on his toes or squat, for fear of foot and knee pain. Generally, McKinney found no abnormal results, and prescribed ibuprofen.

McKinney followed up on plaintiff's chronic pain on August 3, 2016. McKinney found plaintiff stable and continued his prescription for Nortriptyline. Plaintiff and McKinney disagree as to the degree of pain plaintiff reported during that visit. A nurse saw plaintiff about persistent pain in his neck and shoulders on August 17, 2016. The nurse did not observe any swelling or bruising.

McKinney again evaluated plaintiff on September 2, 2016, for recurrent soreness in the areas of the left clavicle and sternocleimastoid muscle area. He noted (1) normal range of motion, (2) no neurological signs or symptoms, (3) fluid gate, (4) full range of motion, (4) no mass in neck or defect in muscle, and (5)

soreness to deep palpation in level clavicle and upper check areas. McKinney ordered lab work and prescribed analgesic balm.

**Treatment for Carpal Tunnel and  Wrist Paralysis**

### i.      *Pre-Transfer Treatment*

In January 2012 MDOC physicians issued plaintiff a wrist brace. During a July 2012 visit, plaintiff requested a wrist brace; he claimed that custody had confiscated his brace when he went into administrative segregation. The examining nurse noted that plaintiff had "had a full range of motion in his wrist and no swelling." [Doc. #43-1 at 4]. Plaintiff later requested an ace wrap for his wrist in September 2012; the nurse found no abnormalities upon assessing plaintiff's wrist.

Plaintiff received another examination in January 2014; a doctor prescribed Naproxen and provided him with a splint for the affected right wrist. The physician noted an active range of motion and a negative phalen sign (for assessing carpel tunnel syndrome).

In September 2014, plaintiff continued to bring up his wrist pain. Records reflect that plaintiff's wrist was swollen at the base of the thumb; he had been in an altercation several weeks prior to the visit. The nurse issued Tylenol and recommended rest. A nurse then saw plaintiff again for wrist pain and issued Nortriptyline (Pamelor) (a "tricyclic antidepressant effective in the management of chronic pain"). [Doc. #43 at 9].

### ii.      *Treatment after Transfer to PCC*

The parties dispute whether plaintiff complained about wrist pain during visits in January and April 2015. Generally, plaintiff states that his complaints of wrist pain were ignored. The parties do agree that plaintiff received an examination by

McKinney for wrist pain in August 2015. Plaintiff told McKinney he experienced sharp pain when picking up objects. McKinney reviewed a 2010 x-ray, which was an "essentially neg[ative] exam." [Doc. #43-3 at 64]. McKinney found that plaintiff's symptoms were not consistent with carpal tunnel syndrome. He accordingly determined that a wrist brace was not medically necessary. McKinney also specifically noted that he was "unable to find any lay-in for a wrist brace." [Doc. #43-3 at 65].

Plaintiff had an altercation with his cellmate in November 2015, and McKinney evaluated plaintiff's condition in December 2015. Plaintiff reported discomfort in his wrist. The parties dispute whether plaintiff then told McKinney that he experienced discomfort while doing 100 pushups, two to three times each week. McKinney conducted an examination, which showed normal results, and indicated that no further treatment would be required.

## II.  **Procedural Background**

The Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, requires that prison inmates exhaust administrative remedies prior to filing an action under 42 U.S.C. § 1983. 42 U.S.C. § 1997(e)(a). Absent exhaustion, a court may not consider a prisoner's claims. *Jones v. Bock,* 549 U.S. 199, 211 (2007). This exhaustion requirement "applies to all prisoners seeking redress for prison circumstances or occurrences." *See Porter v. Nussle*, 534 U.S. 516, 520 (2002). The procedure of the correctional facility defines the boundaries of exhaustion, not the PLRA. *Burns v. Eaton*, 752 F.3d 1136, 1141 (8th Cir. 2014); *see Woodford v. Ngo*, 548 U.S. 81, 90 (2006).

Defendants assert that plaintiff has not exhausted any of his claims. They acknowledge that plaintiff filed grievances and informal resolution requests, but contend that plaintiff failed to exhaust any of those complaints in accordance with the Missouri Department of Corrections Grievance Procedure. Plaintiff counters that he did exhaust his claims; he further contends that Corizon procedurally defaulted or "abandoned" several claims, manipulated the grievance process, and retaliated against him by stealing documents necessary for exhaustion of his claims.[10] [Doc. #54 at 18–20]. Neither party provides any documentation of the administrative claims. Moreover, neither party provides the correctional facility's grievance procedure.

Failure to exhaust is an affirmative defense. *Nerness v. Johnson*, 401 F.3d 874, 876 (8th Cir. 2005). Accordingly, "[i]nmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Rather, defendants bear the burden of raising and proving the absence of exhaustion. *Porter v. Sturm*, 781 F.3d 448, 451 (8th Cir. 2015); *Nerness*, 401 F.3d at 876. Here, defendants have not provided sufficient proof to support their failure to exhaust defense. Thus, the defendants are not entitled to summary judgment based on exhaustion.

### III.   <u>Legal Standard</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a motion for summary judgment, the

---

[10] Plaintiff specifically cites a portion of the policy that procedural requirements are negated when a response time is exceeded by the correctional facility. [Doc. #54 at 18].

court is required to view the facts in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). If the moving party meets its burden, the non-moving party may not rest on the allegations of its pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012); *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 853 (8th Cir. 2012). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita*, 475 U.S. at 587).

**IV. <u>Discussion</u>**

**a. Deliberate Indifference**

Deliberate indifference to a serious medical need constitutes cruel and unusual punishment, in violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 102–03 (8th Cir. 1976). Deliberate indifference involves both an objective and a subjective analysis. *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997). The objective component requires a plaintiff to demonstrate an objectively serious medical need. *Id.* "A medical need is objectively serious if it either has been 'diagnosed by a physician as requiring treatment' or is 'so obvious that even a

layperson would easily recognize the necessity for a doctor's attention.'" *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014) (quoting *Coleman*, 114 F.3d at 784).

There are two components to the subjective analysis: (1) knowledge of the substantial risk of harm, and (2) deliberate disregard of that risk. *Letterman v. Does*, 789 F.3d 856, 862 (8th Cir. 2015). "A party need not necessarily show that the actor actually knew of the substantial risk of harm to an inmate; the district court can infer knowledge if the risk was obvious." *Id.* As to the second piece of the subjective analysis –evaluating whether an official deliberately disregarded a risk– courts "consider his actions in light of the information he possessed at the time, the practical limitations of his position and alternative courses of action that would have been apparent to an official in that position." *Id.* (internal quotation marks omitted) (quoting *Gregoire v. Class*, 236 F.3d 413, 419 (8th Cir. 2000)). This showing requires a mental state "akin to criminal recklessness." *Scott*, 742 F.3d at 340 (quoting *Gordon v. Frank*, 454 F.3d 858, 862 (8th Cir. 2006)). Thus, the prisoner "must show more than negligence, more even than gross negligence." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995)).

Evaluating whether a prison's medical staff acted with deliberate indifference involves a factually-intensive inquiry. *Meuir v. Greene Cty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir. 2007) (citing *Coleman*, 114 F.3d at 784; *Jensen v. Clarke*, 94 F.3d 1191, 1197–98 (8th Cir. 1996)). A plaintiff-inmate "must clear a substantial evidentiary threshold to show that the prison's medical staff deliberately disregarded the inmate's needs by administering an inadequate treatment." *Id.*

## **Inadequate Treatment of Medical Conditions**

Defendants argue that there is no genuine issue of material fact as to any of plaintiff's claims of constitutionally inadequate medical care. In support of the motion defendants have submitted hundreds of pages of plaintiff's medical records, which they claim show that they "exhaustively evaluated" plaintiff's various health complaints. [Docs. #43-2, 43-3]. They also offer the declaration of McKinney to demonstrate the adequacy of his care. Defendants further contend that Corizon "adequately staffed the MDOC facilities with qualified personnel." [Doc. #41 at 2]. They aver that in the two years since plaintiff arrived at PCC Corizon staff "evaluated plaintiff multiple times a month." [Doc. #42 at 2]. Accordingly, defendants argue that there is no genuine issue of material fact that Corizon did not implement policies resulting in deliberate indifference to plaintiff's serious medical needs.

Plaintiff has responded with his own declaration, medical records, and the affidavits[11] of two other inmates.[12] He disputes many of the facts in McKinney's declaration. In particular, he argues that on many occasions, McKinney ignored his complaints of pain. He also argues that McKinney created a façade of adequate treatment by conducting rudimentary physical exams.

---

[11] Defendants object to the affidavits provided. They argue that they are not admissible under the Federal Rules of Evidence due to (1) lack of personal knowledge and (2) lack of medical expertise. Defendants are correct that evidence offered under Federal Rule of Civil Procedure 56(c) must contain admissible content, even if in its current *form* it would not be admissible at trial. *Neff v. World Publ'g Co.*, 349 F.2d 235 (8th Cir. 1965).

[12] The Court recognizes that plaintiff is pro se. However, that does not mean that he will be exempt from providing "specific factual support for his claims to avoid summary judgment." *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001).

Defendants do not dispute that each of plaintiff's physical conditions constitutes a serious medical need. Accordingly, the Court will move to the question of whether defendants acted with deliberate indifference to those medical needs.[13]

### i. Respiratory Symptoms

Defendants argue that McKinney did not act with deliberate indifference because he adequately responded to plaintiff's respiratory symptoms. First they argue that McKinney examined plaintiff on twenty-five separate occasions. Second, they assert that McKinney relied on his analysis of diagnostic tests and did not subjectively observe a serious medical need. Third, defendants contend that choices regarding diagnostic techniques constitute "a classic example of a matter for medical judgment." [Doc. #60 at 10 (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976)).] Fourth, defendants dispute that plaintiff's respiratory symptoms have progressed as a consequence of McKinney's treatment; in fact, they argue that "the medical staff at Potosi have [not] noted any exacerbation of [p]laintiff's symptoms," rather, "he has improved." *Id.* at 9. Fifth, defendants argue that plaintiff interfered with attempted diagnostic testing as he "refused to follow instructions for the further work up for spirometry." *Id.* at 10. Thus, defendants contest both that there is a genuine issue of material fact as to (1) McKinney's deliberate indifference, and

---

[13] Defendants also argue that plaintiff has included arguments in his summary judgment response, which were not included in his amended complaint. Namely, they claim that plaintiff adds new allegations regarding McKinney's failure to treat his bunions and respiratory issues, as well as Corizon's statewide policies on Gabapentin prescriptions and bunion surgeries. [Doc. #60 at 2–3]. A review of the record demonstrates that plaintiff was granted an extension to file an amended complaint until August 20, 2016, and he did so on August 15, 2016. [Doc. #13]. That amended complaint alleges deliberate indifference to plaintiff's respiratory issues, bunions and need for foot surgery, and Corizon's denial of effective medication. Notably, defendants answered this amended complaint on December 20, 2016. [Doc. #26]. Accordingly, the Court disagrees with defendants' contention.

(2) a causal connection between the purported constitutional violation and plaintiff's injuries.

Plaintiff claims that there is a genuine issue of material fact regarding whether McKinney was deliberately indifferent to his serious respiratory issues. He contends that McKinney failed to adequately run diagnostic tests or provide treatment for the appearance of blood in his sputum, which was purportedly accompanied by chest pain, shortness of breath, and a burning sensation in his lungs, among other symptoms. He argues that more "progressive" or in-depth testing should have been ordered. [Doc. #56 at 6–7]. Plaintiff argues that this is especially so because he received an x-ray in 2014 which "suggested Sarcoidosis or Pneumonitis." *Id.* at 6. He adds that cost-saving motivated the failure to conduct more advanced testing, such as CAT scans or MRIs. With regard to causation, plaintiff argues that his condition has worsened as a result of this deliberate indifference. In particular he explains that exertion has become more difficult and that he has experienced secondary complications including neck, collarbone, and shoulder pain.

At this stage the Court will "take as true those facts asserted by plaintiff that are properly supported in the record." *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001); *see Pool v. Sebastian Cty., Ark.*, 418 F.3d 934, 944 (8th Cir. 2005). Prior to his November 2014 transfer plaintiff received extensive respiratory testing – physicians ordered chest x-rays in December 2013, March 2014, and August 2014. They also took sinus x-rays in March 2014. Tests of plaintiff's sputum, as well as a tuberculosis test were conducted. Medical personnel issued several prescriptions including nebulization treatments, Cipro, Claritin, a saline spray, and

Cetirizine. Further, a physician noted the possibility of that plaintiff might be affected by conditions, including microtic hypochromia, sarcoids, and hypersensitivity pneumonitis. Plaintiff's chest x-rays revealed the presence of granulomas. Wheezing and diminished breath sounds were observed on exam.

Once McKinney took over plaintiff's treatment he reviewed plaintiff's prior diagnostic testing, ordered spirometry testing, and conducted several physical exams. During physical exams McKinney noted no symptomology – including (1) no signs of respiratory distress, (2) no coughing, (3) clear lungs, (4) clear breathing sounds, (5) no shortness of breath, (6) good air movement, and (7) no indications of disease. McKinney also reviewed plaintiff's prior x-rays and lab results. McKinney therefore exercised his medical judgment and concluded that no further diagnostic testing was required beyond spirometry tests and physical exams. *Cf. Croft v. Hampton*, 286 F. App'x 955, at 956–57 (8th Cir. 2008) (reasoning that a physician may not have actually exercised his independent judgment where he did not review x-rays or examine the inmate). And notably, it is a well-established tenet that a "medical decision not to order an x-ray, or like measures, does not represent cruel and unusual punishment." *See Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976). Moreover, "an inmate's mere disagreement with the course of medical treatment does not give rise to a constitutional claim." *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992); *see, e.g., Sherrer v. Stephens*, 50 F.3d 496, 497 (8th Cir. 1994) (noting that a physician's conservative treatment approach did not rise to the level of deliberate indifference).

Any claim that plaintiff's medical complaints were ignored by the defendants is belied by the voluminous medical record. Plaintiff has not put forth any evidence

showing that his respiratory complications are not being treated properly. *See Jimmerson v. Missouri*, 2010 WL 924377 (E.D. Mo. Mar. 11, 2010). He has not shown an intentional denial or delay in access to medical care. *Vaughn v.* Lacey, 49 F.3d 1344, 1346 (8th Cir. 1995), nor has he substantiated the allegation that his condition worsened as a result of the defendants' actions or inaction. The Court finds that there is no material factual dispute with respect to plaintiff's claim that McKinney was deliberately indifferent to his respiratory ailments.[14]

### ii. Podiatry Issues

Defendants argue that McKinney did not act with deliberate indifference in treating plaintiff's flat feet and bunions.[15] Defendants argue that at the time plaintiff requested medical shoes, he was in administrative segregation, and therefore was not "allowed such shoes." [Doc. #60 at 9]. Thus, they claim, McKinney's medical assessment did not constitute an outright denial for medical shoes, but rather a decision to re-evaluate plaintiff once he joined the general population. And moreover, defendants argue, "there is no evidence that [p]laintiff is a surgical candidate" for a bunionectomy. *Id.* at 8.[16]

---

[14] Because plaintiff has failed to demonstrate a genuine issue of material fact on the issue of deliberate indifference, the Court need not address issues of causation.

[15] The Court notes that district courts in the Eighth Circuit have found that bunions are a non-serious medical condition. *See Gard v. Dooley*, No. 4:14-CV-04023-LLP, 2016 WL 5376236, at *31 (D. S.D. Mar. 4, 2016).

[16] Defendants also challenge plaintiff's use of affidavits from other inmates. Under Federal Rule of Civil Procedure 56, "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The affidavit of Ronald Earl Newton describes his experience – he states he had three surgeries on his right foot for bunions. Although he is not qualified to assess plaintiff's bunion condition, an explanation of his experience comes from personal knowledge and would be admissible. [Doc. #55-1]; *see Jain v. CVS Pharmacy, Inc.*, 779 F.3d 753 (8th Cir. 2015) (reasoning that "[l]ay opinion testimony is admissible if the witness has personal knowledge or perceptions based on industry experience." (internal quotation marks and citations omitted)). Accordingly, portions of Newton's affidavit will be admissible, and the Court will not consider those statements that require medical

Plaintiff alleges that McKinney put his safety at risk, as he refused to address his flat feet and bunions with a bottom bunk lay-in, medical shoes, or surgery.[17] Plaintiff cites earlier diagnoses and prescriptions by other physicians. In particular, he notes that he held a prescription for medical shoes when he arrived at PCC. Plaintiff complains that under the care of McKinney he did not receive any treatment or referral for his painful bunions. He also offers the affidavits of other inmates supporting the severity of his bunions, which opine that other inmates received medical shoes or bunionectomy surgeries.

When an official denies a person treatment that has been ordered or medication that has been prescribed, constitutional liability may follow. *Foulks v. Cole Cty., Mo.*, 991 F.2d 454, 457 (8th Cir. 1993). In this case, McKinney's reason for not issuing medical shoes or referring plaintiff for surgery was based on his medical judgment. His evaluation of plaintiff—including consideration of plaintiff's activities of daily living and ease in his ability to ambulate without a limp or any other signs of pain—led him to conclude that neither treatment was medically indicated.. *Cf. Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004) (where withholding of dental treatment was for nonmedical reasons). Moreover, it appears that McKinney repeatedly considered plaintiff's "asserted needs in good faith," and simply did not consider him to "meet the requisite criteria" for medical shoes or for a bunionectomy. *See Logan v. Clarke*, 119 F.3d 647, 649–50 (8th Cir. 1997). He instead determined that plaintiff simply needed wider shoes. McKinney exercised

---

qualifications. Similarly, Charles Harvey's affidavit largely expounds on his personal experience, McKinney's reputation, and his observation of plaintiff's pain when ambulating. [Doc. #55-1 at 3–5]. Those portions of the affidavit are admissible even if attempts to define plaintiff's condition are not.

[17] Plaintiff argues that expert testimony would establish that bunions are not simply a "cosmetic" issue, but rather, "a disabling condition that should be treated." [Doc. #56 at 3].

his independent medical judgment in determining that special shoes, surgery, and a bottom-bunk lay-in were not required. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) ("prison doctors remain free to exercise their independent medical judgment"); *see, e.g., Brewer v. Blackwell*, 836 F. Supp. 631, 644 (S.D. Iowa Oct. 26, 1993) (prison doctor was entitled to exercise his independent judgment and disagree with the recommendation of a consulting physician); *see, e.g., Prater v. Dep't of Corr.*, 11 F. App'x 668, 669 (8th Cir. 2001). And he did not deny or delay treatment; rather, he examined plaintiff's feet on multiple occasions and recommended use of arch supports. The affidavits plaintiff submits only show that there were other inmates whose medical problems were addressed in a different way. Such evidence has no bearing on plaintiff's deliberate indifference claim.

After considering the evidence submitted, the Court concludes that there is no genuine issue of material fact with respect to the claim that McKinney was deliberately indifferent to plaintiff's podiatric needs.

### iii. Knee Instability and Pain

Defendants argue that McKinney extensively evaluated plaintiff's knee instability and pain, and therefore did not act with deliberate indifference to that serious medical need. Defendants also argue that no medical personnel ever diagnosed "severe knee instability." [Doc. #60 at 6]. According to defendants, "[e]ven if a prior physician ordered sleeves or wraps, this does not mean Dr. McKinney acted with deliberate indifference when he elected for physical therapy." *Id.*

McKinney and Corizon medical staff regularly examined plaintiff's knees. They noted that any symptoms of swelling or crepitus were minor. They also did

not observe any popping or injuries to the knee in his x-rays. McKinney did not observe any limping or difficulty getting on and off the exam table. Plaintiff generally continued to engage in his activities of daily living as well as his exercise routines. Accordingly, McKinney repeatedly considered plaintiff's "asserted needs in good faith," and simply did not consider him to "meet the requisite criteria" for a knee sleeve. *See Logan v. Clarke*, 119 F.3d 647, 649–50 (8th Cir. 1997). Differences in opinion among physicians on treatment options do not substantiate a constitutional claim. *Vaugh v. Lacey*, 49 F.3d 1344, 1346 (8th Cir. 1995). Notably, disagreement with the *type* of care provided – here, physical therapy and pain medication, rather than a knee sleeve or steroid injections – is not sufficient to establish a deliberate indifference claim. *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990).

The Court finds that McKinney did not act with deliberate indifference with regard to plaintiff's knee pain and instability. McKinney is therefore entitled to summary judgment on this issue.

### iv.    Chronic Pain Treatment: Arthritic, Sciatic, and Joint Pain

Defendants claim that there is no genuine issue of material fact that McKinney adequately treated plaintiff's chronic pain – which arose from his arthritis, sciatica, and trigeminal neuralgia. First they argue that since 2012, plaintiff was enrolled in the chronic pain clinic. That clinic ensured regular evaluations and treatment for plaintiff's left leg sciatic and trigeminal neuralgia pain. Indeed, they argue that plaintiff received twenty-five evaluations for his conditions, including knee, wrist, shoulder, and back pain, from Dr. McKinney between November 2014 and October 2016. Second, defendants offer evidence of the numerous medications

prescribed to relieve plaintiff's pain including, (1) Gabapentin (Neurontin), (2) Carbamazepine (Tegretol), and (3) ibuprofen. Third, defendants argue that they replaced plaintiff's Gabapentin prescription with adequate substitutes; a substitute was necessary because plaintiff repeatedly diverted the medication and due to system-wide abuse of the drug. Fourth, they contend that all objective signs indicated that plaintiff remained active and stable on substitute pain medications.

Plaintiff claims that McKinney deliberately deprived him of the only medication that mitigated hip joint deterioration, arthritis, neuralgia, and sciatic pain. He complains that Corizon selectively permitted prisoners to use Gabapentin, despite an alleged system-wide ban on the prescription. Plaintiff adds that McKinney was deliberately indifferent to his trigeminal neuralgia pain and persisted in prescribing an ineffective medication (Nortriptyline), due to his "inexperience and apathy." [Doc. #56 at 5]. Plaintiff also argues that the frequency of visits does not reflect care quality, but rather, his own "persistence." *Id.* at 10.

The prescribing of an improper medication or withholding of pain medication may be sufficient to avoid summary judgment on a deliberate indifference claim. *Roberson v. Bradshaw*, 198 F.3d 645, 648 (8th Cir. 1999); *Majors v. Baldwin*, 456 F. App'x 616, 617 (8th Cir. 2012). Thus, in *Roberson*, for example, the plaintiff had "complaints of serious adverse reactions." *Id.; see also Lair v. Oglesby*, 859 F.2d 605, 606 (8th Cir. 1988). In a similar case, the prisoner was refused any prescription *or* over-the-counter pain medication to ameliorate his post-surgical pain. *Dadd v. Anoka Cty.*, 827 F.3d 749, 756 (8th Cir. 2016). Conversely, the Eighth Circuit has stated that plaintiffs "cannot expect [painkillers] to eliminate all pain – painkillers usually do not." *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir.

1997). In some cases, painkillers may be properly avoided due to an inmate's history of drug abuse. *Id.* at 649–50.

Here, medical personnel attempted to respond to plaintiff's complaints of pain with various corrective actions – they switched medications and changed his dosages. *See, e.g., Jolly v. Knudsen*, 205 F.3d 1094, 1097 (8th Cir. 2000). Physicians were compelled to alter his prescription in connection with multiple reports of diversion. Moreover, there were no *objective*, obvious indicia of pain. Plaintiff's physicals indicated proper functioning. And mere disagreement as to the proper drug cannot serve as the basis for a claim of deliberate indifference. *Phillips v. Jaspar Cty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006); *Sills v. Kelley*, No. 2:08-CV-00198- SWW/BD, 2009 WL 2208310, at *3 (E.D. Ark. July 20, 2009) (failure to prescribe a particular medication does not rise to the level of a constitutional violation).

The evidence establishes that McKinney did not act with deliberate indifference with respect to plaintiff's chronic pain.

### v. Carpal Tunnel and Paralysis

As a preliminary matter, defendants contend that "carpal tunnel is not wrist paralysis," and plaintiff never received a wrist paralysis diagnosis. [Doc. #60 at 6]. They point out that nursing staff evaluated plaintiff's wrist pain, but found no signs or symptoms of dysfunction. Lastly, defendants aver that even if plaintiff previously received a wrist brace, McKinney's decision not to do so does not equate to deliberate indifference.

The evidence shows that McKinney examined plaintiff's wrists on multiple occasions. He also reviewed 2010 x-ray records, which revealed no abnormalities.

Moreover, McKinney noted that plaintiff's fitness and daily living activities were not consistent with a serious medical condition. Plaintiff puts forth no evidence that he received a diagnosis for carpal tunnel syndrome or wrist paralysis. Therefore, plaintiff has "not established that he had a sufficiently serious medical need for a wrist brace." *Cottrell v. Uhde*, No. C97-3086-MWB, 2000 WL 34032761, at *8 (N.D. Iowa Feb. 8, 2000). McKinney is entitled to judgment as a matter of law on this claim.

## Claims Against Corizon

Plaintiff contends that Corizon is vicariously liable for any inadequate medical treatment provided by McKinney. It is well-settled that "[a] supervisor is not vicariously liable under 42 U.S.C. § 1983 for an employee's unconstitutional activity." *White v. Holmes*, 21 F.3d 277, 280 (8th Cir. 1994); *see, e.g., Martin v. Corizon Corr. Med. Servs.*, No. 5:13-CV-00364 (KGB-JJV), 2014 WL 1779295 (E.D. Ark. Mar. 7, 2014). Thus, Corizon cannot be held liable based on a theory of *respondeat superior.*

Plaintiff also argues that Corizon established a policy or procedure of "profits over prisoners," amounting to deliberate indifference to his serious medical needs. [Doc. # 13 at 16–18]. He claims that this policy resulted in understaffing and hiring of incompetent personnel. In support of these contentions, plaintiff offers that McKinney is the only physician employed at PCC. He also contends that this policy resulted in the deprivation of a proper pain medication and a bunionectomy. Plaintiff adds that Corizon systematically manipulates and falsifies records to undermine the prisoner grievance process and obstruct access to the courts. Defendants contest each of these claims and point out that plaintiff does not

provide evidence "of what the correct level of staffing should be," and "offers no evidence of training or alleged inadequate training." [Doc. #60 at 11].

Policy-based liability under 42 U.S.C. § 1983 is imposed when a plaintiff can show "a policy, custom, or official action that inflicted an actionable injury." *Johnson v. Hamilton*, 452 F.3d 967, 973 (8th Cir. 2006). Even if there was only one doctor at PCC, there is no evidence that that caused plaintiff to experience any "lengthy delays" for treatment. *See Cullor v. Baldwin*, 830 F.3d 830, 838 (8th Cir. 2016). On the contrary, the record demonstrates that plaintiff received medical treatment in a timely fashion and saw doctors and other medical personnel on a regular basis. All of his medical complaints were expediently addressed.

Plaintiff's contention that Corizon medical personnel are incompetent is no more than an expression of his personal opinion. Plaintiff has failed to provide any evidence that staffing issues adversely affected the medical care he needed. *See Cullor*, 830 F.3d at 839; *Butler v. Corizon Health, Inc.*, No. 4:16-CV-00590 (AGF), 2017 WL 2935662, at *7–8 (E.D. Mo. July 10, 2017).

Plaintiff also asserts that Corizon implemented a policy to obstruct access to the courts. Plaintiff alleges that Corizon, in furtherance of the policy, falsified records and worked with PCC officials to have documents stolen from his cell. Again, plaintiff presents no evidence to support these allegations. In the absence of such evidence, these allegations do not create a material factual dispute.

The Court concludes that Corizon is entitled to judgment as a matter of law.

**\*\*\***

For the reasons discussed above,

**IT IS HEREBY ORDERED** that the joint motion of the defendants for summary judgment [Doc. #41] is **granted**.

**IT IS FURTHER ORDERED** that plaintiff's motion for injunctive relief [Doc. #13] is **denied.**

A judgment in accordance with this Memorandum and Order will be entered separately.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 4th day of August, 2017.